374 F.2d 595
 In the Matter of NAZARETH FAIR GROUNDS & FARMERS MARKET,
INC., Debtor. Arnold A. WEINSTEIN, Appellant,
v.
Charles SELIGSON and Melvin Lloyd Robbins, Appellees.
Alex L. ROSEN, Appellant,
v.
Irving J. WOLF, Appellee.
 No. 267, Docket 30888.
 United States Court of Appeals Second Circuit.
 Argued Jan. 5, 1967.
Decided March 21, 1967.
 
 Arnold A. Weinstein, New York City, pro se.
 Charles Seligson, New York City, pro se.
 Melvin Lloyd Robbins, New York City, pro se and for Irving J. Wolf in support of order denying compensation to Alex L. Rosen.
 Alex L. Rosen, New York City, pro se.
 Before LUMBARD, Chief Judge, and FRIENDLY and HAYS, Circuit Judges.
 LUMBARD, Chief Judge.
 
 
 1
 These appeals by various parties to this protracted Southern District Chapter X reorganization proceeding of the Nazareth Fair Grounds and Farmers Market, Inc., now in its fourteenth year, seek review of a district court order of September 12, 1966 which fixed allowances for services rendered. These applications were filed on September 20 and 21, 1965. Despite the fact this court had, on more than one occasion, commented on the unnecessary and protracted delays in these proceedings, Wolf v. Nazareth Enterprises, Inc., 303 F.2d 152, 155 (2 Cir. 1962); Fried v. Margolis, 296 F.2d 670, 678 (2 Cir. 1961), cert. dismissed as improvidently granted sub nom. Wolf v. Weinstein, 372 U.S. 633, 636, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963), it was not until August 25, 1966 that the district judge filed his opinion. Finally, on September 12, 1966, almost one year after the applications were made, the order from which these appeals are taken was entered. We granted leave to appeal on September 26, 1966 pursuant to 250 of the Bankruptcy Act, 11 U.S.C. 650.
 
 
 2
 For reasons set forth below, we set aside the district court's denial of any allowance for legal services to Alex Rosen, attorney for the debtorAnd we allow $90,000 for these services; we reduce the allowance of Charles Seligson for compensation for services as examiner from $50,000 to $35,000; and we affirm the allowance made to Melvin Lloyd Robins.
 
 Services ofAlex Rosen
 
 3
 On September 28, 1953, the same day the district court continued the debtor in possession of its property and business, the debtor was authorized to employ Rosen as its attorney in this and all other proceedings. Rosen had prepared the petition for the Chapter X reorganization, and he has played an active part in the numerous and drawn-out proceedings since then, including among other things the drafting of orders having to do with the debtor's business, the examination and settlement of claims, the validity of outstanding judgments, and litigation to determine who the debtor's stockolders were. No one can seriously question that these services were necessary and valuable, as this court itself is well aware from its review of these matters on at least six prior occasions. See Rosen v. Sugarman, 357 F.2d 794 (2 Cir. 1966); Wolf v. Nazareth Enterprises, Inc., 303 F.2d 152 (2 Cir. 1962); In re Nazareth Fairgrounds & Farmers Mkt., Inc., 296 F.2d 678 (2 Cir. 1961), rev'd sub nom. Wolf v. Weinstein, 372 U.S. 633, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963); Fried v. Margolis, 296 F.2d 670 (2 Cir. 1961), cert. dismissed as improvidently granted sub nom. Wolf v. Weinstein, 372 U.S. 633, 636, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963); Wolf v. Nazareth Fairgrounds & Farmers' Mkt., Inc., 280 F.2d 891 (2 Cir. 1960); Margolis v. Nazareth Fairgrounds & Farmers Mkt., Inc., 249 F.2d 221 (2 Cir. 1957). In addition, this court has suffered innumerable incidental applications in connection with these appeals.
 
 
 4
 Rosen's petition for an allowance of $150,000 for services covers 282 pages, consisting in large part of itemized accounts of hours spent preparing and analyzing various documents and memoranda of law, and includes a lengthy summary of proceedings before the district court and the referee in which he participated. The petition was assembled from the voluminous papers and records accumulated by Rosen over 13 years and by reference to court records and minutes. As no detailed daily record was kept, the petitioner in most instances resorted to estimates for a particular activity or class of activitites. He claims a total of 6,138 hours, of which all but 100 hours was his own time.
 
 
 5
 Although the district court would have been much better advised if Rosen had made a more accurate record at the time of the events in question, we have no doubt that the net result presents a substantially correct summary of the petitioner's activities and that the estimate of time spent is an approximation sufficiently accurate to allow the district court to pass upon his application.
 
 
 6
 As we pointed out in In re Hudson & Manhattan R.R., 339 F.2d 114 (2 Cir. 1964), an attorney acting by court appointment and expecting to be paid from the estate is under a duty to keep accurate daily records so far as possible. We realize that this is not always an easy matter for single practitioners or those operating relatively small law offices. Moreover, as appears from all of the applications before us, a busy office is almost never able to keep track of a multitude of small matters such as telephone calls and the sending and receipt of letters. We did not mean to imply by anything we said in Hudson & Manhattan that the failure to keep complete records for all the work an attorney does should result in a total disallowance of any claim for services; we merely meant that the failure to keep current and accurate records from day to day is a factor to be considered in evaluating the services and in accepting estimates which the attorney makes at some later date merely on his own recollection at a time when he is looking forward to compensation. Thus the district court erroneously and unjustifiedly applied Hudson & Manhattan to Rosen's application in holding that no allowance should be made to him.
 
 
 7
 The district court, although of the view that no allowance should be made to Rosen, Apart from $249.63 for reimbursement of expenses, nevertheless stated its opinion that were it not for the failure to keep the kind of records which the district court thought he should have kept, the services would be worth only $25,000. We do not agree. Such an allowance would be grossly insufficient. It seems to us that the district judge would have been well advised had he referred to another member of the court the matter of passing upon Rosen's application.
 
 
 8
 In our view, reasonable compensation should be allowed Rosen in the sum of $90,000, together with disbursements in the sum of $249.63, for a total of $90,249.63. In view of the nature and quality of Rosen's services and the long time which he has had to wait for compensation, we regret that the size of the estate precludes a more generous allowance.
 
 Claim of the Examiner, Charles Seligson
 
 9
 On October 3, 1956, Judge Sugarman appointed Charles Seligson to be an examiner in this proceeding pursuant to section 168 of the Bankruptcy Act, 11 U.S.C. 568. The apparent reason for this was that the debtor had suffered a fire at Nazareth, Pennsylvania, on August 28, 1956 which had destroyed almost all the structures belonging to the debtor and located on its property, and an offer was then pending to purchase all the debtor's real estate and the remaining structures. The order recited that the examiner was to 'prepare and file a plan for the reorganization of the Nazareth Fair Grounds and Farmers Market, Inc., * * * and to perform the duties imposed upon a trustee under paragraphs (1) to (5) inclusive of 167,'[1] and he was further'directed to investigate the acts, conduct, property, liabilities and financial condition of said debtor, the operation of its business nad the desirability of the continuance thereof, and the rebuilding of said fire-destroyed structures, and the status of its shareholders, and any other matter relative to the proceeding or to the formulation of a plan; and said examiner shall make and deliver a report thereon to the judge not later than sixty (60) days from the date hereof. * * *'
 
 
 10
 Whatever hopes there may have been in 1956 for an early termination of the business or for its reorganization almost nine more years were to pass before the court approved a plan of reorganization on July 27, 1965. Meanwhile, the examiner advised with all the parties and claimants, attended lengthy hearings before the district judge (who meanwhile had taken over from the referee the hearing and determination of the claims of stockholders and almost all the business a referee usually performs), and rendered a lengthy report thereon. He also advised counsel with respect to the drafting of numerous orders and apparently advised the district judge with respect to all matters regarding the reorganization. As Judge Sugarman stated:
 
 
 11
 'Professor Charles Seligson as the examiner was required by me, inter alia, to submit proposed orders, findings and conclusions; to review all proposed orders, findings and conclusions submitted by others and make recommendations thereon; to read and comment upon my drafts of decisions and opinions before they were filed.'[2]
 
 
 12
 The examiner estimates that he and his associates spent a total of 1281 1/2 hours, of which all but 300 was his own time. Although daily summaries are stated for 966 hours, the remainder consists of estimates, as the examiner states that it was impossible to render a complete, detailed account in his application, filed in September 1965. The examiner pointed out that all the claims had been paid in full and that the estate had a total net worth of $460,000, undiminished by the allowances to be made by the district court. The examiner, although believing that the fair value of his services was $144,835, nevertheless asked for only $50,000 in view of the size of the estae and the other applications. The district court allowed him the entire amount requested. While not doubting the value of the examiner's time, as an expert in the field of bankruptcy and reorganization, we think that any charge on the estate beyond $35,000 would not be justified and accordingly we modify the judgment of the district court and direct payment of that sum for services, together with disbursements of $922,87, or a total of $35,922.87.
 
 
 13
 At the same time we question the need for the appointment of any examiner in a reorganization of this size and nature. The statute was not meant to provide an assistant to do much of the work ordinarily done by the district judge. It not only seems to have been unnecessary but it does not appear to have saved any time, and it certainly has added to the expense of administration.
 
 
 14
 Robbins, attorney for Wilson D. Rehrig and Mrtin H. Philip, applies for an allowance and reimbursement for services rendered the estate in recovering judgments against Arnold A. Weinstein for $25,251.31 and Jerome Fried for $93,900.01 based on the Supreme Court's interpretation of section 249 of Chapter X, 11 U.S.C. 649, which required them to return compensation they had received from the debtor because they had traded in stock of the debtor while acting as fiduciaries. Wolf v. Weinstein, 372 U.S. 633, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963), reversing in part our decision, 296 F.2d 678 (2 Cir. 1961). Robbins petitioned both on statutory grounds, section 243, 11 U.S.C. 643, and on equitable grounds, Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), for 25% of these judgments and other benefits to the debtor. The district court allowed him 15% of the judgment obtained against Weinstein and Fried, or $17,872.73, plus disbursements of $2,978.60, a total of $20,851.33. This allowance was entirely appropriate and we affirm so much of the district court's order.
 
 
 15
 We find no merit in the contention of appellant Arnold A. Weinstein that section 249 requires denial of compensation to Robbins because he acted as attorney for clients in the purchase of stock of the debtor. We find no improper conflict of interest. Robbins acquired no beneficial interest for himself and received no commissions or finder's fees. Holdings that transactions by members of an applicant's immediate family may fall within the ban of section 249, e.g., Surface Transit, Inc. v. Saxe, Bacon & O'shea, 266 F.2d 862, 868 (2 Cir.), cert. denied, 361 U.S. 862, 80 S.Ct. 120, 4 L.Ed.2d 103 (1959); In re Central States Elec. Corp., 206 F.2d 70 (4 Cir.), cert. denied sub nom. Henis v. Egan, 346 U.S. 899, 74 S.Ct. 225, 98 L.Ed. 399 (1953); In re Midland United Co., 159 F.2d 340 (3 Cir. 1946), are clearly distinguishable, because they rest upon the ground that if such transactions were allowed an applicant might enrich himself by them in circumvention of section 249. See 6A Collier, Bankruptcy par. 13.18, at 1019-1021 (14 ed. Moore 1965).
 
 
 16
 Appellant Weinstein also contends that Robbins has already been compensated for his services. Judge Sugarman found, however, that Robbins had not received any compensation for the suit he undertook against Weinstein and Fried. As he enriched the estate by his efforts, it makes no difference that he has been paid by his clients for other services he performed for them in representing their interest as stockholders of the debtor.
 
 
 17
 Finally, the appellant Weinstein contends that both Robbins and the examiner Seligson should be denied any allowance because of the relationship between them. We find no impropriety in that relationship. The examiner referred legal business to Robbins, who until August 31, 1956 was an attorney in the employ of the examiner's law firm, and Robbins and the examiner's firm, continued to act together in certain matters.
 
 
 18
 It is undisputed that on October 20, 1956, about two weeks after the examiner's appointment, Robbins, then no longer associated with the examiner's firm, was retained by Rehrig and Philip, who purchased stock of the debtor from 1957 to 1960, which purchases gave them a substantial interest in the proceedings. Judge Sugarman specifically found that Robbins adequately disclosed his prior relationship with the examiner to both Rosen and Weinstein on or about Cotober 1, 1957, and that it was clear from subsequent events that both knew of that relationship.
 
 
 19
 It is important that members of the bar should avoid accepting retainers where to do so gives the appearance of gaining some advantage for the client because of some relationship which may exist between counsel and those who act in a judicial or quasi-judicial capacity. Here the examiner was appointed to act, and in fact he did act, in a quasi-judicial capacity. While there is no statute or rule which prohibits attorneys from acting in such situations, as Robbins did here, it is certainly wise to avoid them when there is a likelihood that the acceptance of such a retainer will give the appearance to other litigants and claimants that the client may achieve some special advantage by retaining the attorney which may not otherwise be available. Whatever the facts, and we find no impropriety shown here, it would have been natural for others to suppose that Robbins had been retained because of his professional relationships and friendship with the examiner and that his client had thereby obtained a special advantage. Here we think the examiner would have been well advised to explain this to Robbins and either cause him to withdraw, or, if he did not, then to disqualify himself from advising with respect to the claims of those whom Robbins represented. The bar, and particularly those members of it who perform quasi-judicial services, must not only avoid impropriety but must carefully quard against the appearance of it. Cf. Canons of Judicial Ethics, 13.
 
 
 20
 In summary, we reverse the district court's ruling denying all compensation to Alex L. Rosen, Attorney for the debtor, and award him $90,249.63 compensation and disbursements; we modify the order of the district court as to Charles Seligson, as examiner, and award him $35,922.87 compensation and disbursements, and we affirm the order of the district court awarding $20,851.33 to Melvin L. Robbins, as attorney for debtor, for compensation and disbursements.
 
 
 
 [1]
 Paragraphs (1) through (5) of section 167 of the Bankruptcy Act, 11 U.S.C. 567, provide:
 'The trustee upon his appointment and qualification-- (1) shall, if the judge shall so direct, forthwith investigate the acts, conduct, property, liabilities and financial condition of the debtor, the operation of its business and the desirability of the continuance thereof, and any other matter relevant to the proceeding or to the formulation of a plan, and report thereon to the judge; (2) may, if the judge shall so direct, examine the directors and officers of the debtor and any other winesses concerning the foregoing matters or any of them; (3) shall report to the judge any facts ascertained by him pertaining to fraud, misconduct, mismanagement and irregularities, and to any causes of action avilable to the estate; (4) may, subject to the approval of the judge, employ such person or persons as the judge may deem necessary for the purpose of assisting the trustee in performing the duties imposed upon him under this chapter; (5) shall, at the earliest date practicable, prepare and submit a brief statement of his investigation of the property, liabilities, and financial condition of the debtor, the operation of its business and the desirability of the continuance thereof, in such form and manner as the judge may direct, to the creditors, stockholders, indenture trustees, the Securities and Exchange Commission, and such other persons as the judge may designate * * *.'
 
 
 [2]
 Letter from Judge Sugarman to Arnold A. Weinstein, November 3, 1966